# United States Court of Appeals for the Federal Circuit

---

**NORTHERN CALIFORNIA POWER AGENCY, CITY OF REDDING, CALIFORNIA, CITY OF ROSEVILLE, CALIFORNIA, CITY OF SANTA CLARA, CALIFORNIA,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1010, 2019-1089

---

Appeals from the United States Court of Federal Claims in No. 1:14-cv-00817-TCW, Judge Thomas C. Wheeler.

---

Decided: November 6, 2019

---

JEFFREY SCHWARZ, Spiegel & McDiarmid LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by LISA DOWDEN, KATHARINE MAPES.

P. DAVIS OLIVER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

———————————

Before MOORE, BRYSON, and CHEN, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This action was brought in the United States Court of Federal Claims by the Northern California Power Agency and three California cities—the City of Redding, the City of Roseville, and the City of Santa Clara. The plaintiffs all purchase hydroelectric power that is generated by power plants under the jurisdiction of the United States Bureau of Reclamation ("Bureau"), an agency within the Department of the Interior. The plaintiffs are seeking to recover payments that they claim were unlawfully assessed and collected by the Bureau in violation of section 3407(d) of the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4706, 4706–31 (1992).

The dispute turns on the meaning of a provision in section 3407(d) of the CVPIA that requires that certain payments made by recipients of power and water from the project be assessed in the same proportion, to the greatest degree practicable, as other charges assessed against recipients of water and power from the project. After a trial on liability, the Court of Federal Claims concluded that the Bureau's interpretation of the statute was correct and dismissed the plaintiffs' complaint. *N. Cal. Power Agency v. United States*, 139 Fed. Cl. 74 (2018) ("*NCPA*"). We disagree with the court's interpretation of the statute, and we therefore reverse and remand for further proceedings consistent with this opinion.

I

A

In the 1930s, Congress enacted legislation authorizing the federal government to operate a water management program known as the Central Valley Project ("CVP"). The

CVP, which is the nation's largest federal water management project, is operated by the Bureau of Reclamation and distributes water throughout California's Central Valley.

In addition to distributing water, the CVP generates hydroelectric power through dams and power plants built as part of the project. The CVP sells that power to cities and other purchasers through its agent, the Department of Energy's Western Area Power Administration. The rates charged to CVP water and power customers reimburse the Bureau for the proportionally allocated costs of building, operating, and maintaining the CVP. Water customers are responsible for roughly seventy-five percent of those costs. Power customers, including the plaintiffs, are responsible for the remaining twenty-five percent. Those allocations are intended to reflect the relative benefits that water and power customers derive from the CVP. Water customers are responsible for a larger proportion of project costs because the CVP is primarily a water-focused project.

More than half a century after the CVP was first established, Congress enacted the CVPIA to address the environmental impact of the CVP, among other things. *See* CVPIA, Pub. L. No. 102-575, § 3402, 106 Stat. 4706 (1992). As part of the CVPIA, Congress created a "Restoration Fund," which was to be used to help pay for CVPIA activities, including the restoration of fish and wildlife habitats that the project had disrupted. In order to raise money for the Restoration Fund, Congress directed the Secretary of the Interior to assess several types of charges to CVP water and power customers. One of those charges, known as Mitigation and Restoration payments ("M&R payments"), is at issue in this case.

The plaintiffs seek to recover some of the M&R payments that they claim were unlawfully assessed by the Bureau in violation of the CVPIA. Specifically, they allege that the Bureau has ignored the "proportionality requirement" in the statute, which provides that M&R payments

"shall, to the greatest degree practicable, be assessed in the same proportion . . . as water and power users' respective allocations for repayment of the Central Valley Project." CVPIA § 3407(d), 106 Stat. at 4727–28. Although the power customers' allocated share of the CVP repayment costs has been only about twenty-five percent of the total repayment costs, the Bureau in recent years has charged the power customers nearly half of the total M&R payments.

B

Section 3407(b) of the CVPIA authorizes up to $50 million per year to be appropriated to the Secretary of the Interior from the Restoration Fund to carry out the habitat restoration and other programs authorized by the statute. CVPIA § 3407(b), 106 Stat. at 4726. Sections 3407(c)(2) and 3407(d) govern the amount of M&R payments the Bureau can assess and collect each year to replenish the Restoration Fund. As the parties agree, section 3407(c)(2) describes two methods for calculating M&R payment collections. The parties refer to the first method as the "appropriations approach"; they call the second method the "$50 million approach."

The appropriations approach is defined by the first part of section 3407(c)(2), which provides:

> The payment described in this subsection shall be established at amounts that will result in the collection, during each fiscal year, of an amount that can be reasonably expected to equal the amount appropriated each year, subject to subsection (d) of this section, and in combination with all other receipts identified under this title, to carry out the purposes identified in subsection (b) of this section . . . .

CVPIA § 3407(c)(2), 106 Stat. at 4726.

The $50 million approach, which the parties agree governs this case, is defined by the second part of section 3407(c)(2), which provides:

> *Provided*, That, if the total amount appropriated under subsection (b) of this section for the fiscal years following enactment of this title does not equal $50,000,000 per year (October 1992 price levels) on an average annual basis, the Secretary shall impose such charges in fiscal year 1998 and in each fiscal year thereafter, subject to the limitations in subsection (d) of this section, as may be required to yield in fiscal year 1998 and in each fiscal year thereafter total collections equal to $50,000,000 per year (October 1992 price levels) on a three-year rolling average basis for each fiscal year that follows enactment of this title.

*Id.* § 3407(c)(2), 106 Stat. at 4726–27.

The appropriations approach thus requires the Bureau to collect M&R payments in an amount that can reasonably be expected to equal the amount appropriated in a given year. That requirement is "subject to subsection (d)." Starting in 1998, however, the statute provides that if the total amount appropriated in a given year is less than $50 million, the $50 million approach applies. That approach still requires the Bureau to attempt to obtain $50 million in total collections, including M&R payments, for the Restoration Fund. The $50 million collection mandate, however, is "subject to the limitations in subsection (d)." The parties agree that under the $50 million approach, if it is not possible to both collect $50 million and abide by the limitations in subsection (d), abiding by the limitations takes priority. But the parties disagree about which provisions of subsection (d) constitute "limitations."

Subsection (d)(1) of section 3407 provides that in assessing the annual payments to carry out the provisions of subsection (c), the Secretary shall "estimate the amount

that could be collected in each fiscal year pursuant to subparagraphs 2(A) and (B)" of subsection (d) and "shall decrease all such payments on a proportionate basis from amounts contained in the estimate so that an aggregate amount is collected pursuant to the requirements of paragraph (c)(2) of this section." *Id.* § 3407(d)(1), 106 Stat. at 4727.[1]

Subsection (d)(2) of section 3407 provides that the Secretary "shall assess and collect the following mitigation and restoration payments, to be covered to the Restoration Fund, subject to the requirements of paragraph (1) of this subsection." *Id.* § 3407(d)(2), 106 Stat. 4727. Subparagraph (A) of paragraph (2) then provides, in pertinent part:

> (A)  The Secretary shall require Central Valley Project water and power contractors to make such additional annual payments as are necessary to yield, together with all other receipts, the amount required under paragraph (c)(2) of this subsection; *Provided*, That such additional payments shall not exceed $30,000,000 (October 1992 price levels) on a three-year rolling average basis; *Provided further*, That such additional annual payments shall be allocated so as not to exceed $6 per acre-foot (October 1992 price levels) for agricultural water sold and delivered by the Central Valley Project, and $12 per acre-foot (October 1992 price levels) for municipal and industrial water sold and delivered by the Central Valley Project; *Provided further*, That the charge imposed on agricultural water shall be reduced, if necessary, to an amount within the probable ability of the water users to pay as determined

---

[1]    Although the statute refers to subparagraphs (2)(A) and (B) of section 3407, there is no subparagraph (B) in section 3407(d), so the reference to "subsections 2(A) and (B)" applies only to subparagraph (2)(A).

and adjusted by the Secretary no less than every five years, taking into account the benefits resulting from implementation of this title; *Provided further*, That the Secretary shall impose an additional annual charge of $25 per acre-foot (October 1992 price levels) for Central Valley Project water sold or transferred to [certain other entities]; *And Provided further*, That upon the completion of the fish, wildlife, and habitat mitigation and restoration actions mandated under section 3406 of this title, the Secretary shall reduce the sums described in paragraph (c)(2) of this section to $35,000,000 per year (October 1992 price levels) and shall reduce the annual mitigation and restoration payment ceiling established under this subsection to $15,000,000 (October 1992 price levels) on a three-year rolling average basis.

*Id.* § 3407(d)(2)(A), 106 Stat. at 4727. Subsection (d)(2)(A) then concludes with the following sentence: "The amount of the mitigation and restoration payment made by Central Valley Project water and power users, taking into account all funds collected under this title, shall, to the greatest degree practicable, be assessed in the same proportion, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the Central Valley Project." *Id.* § 3407(d)(2)(A), 106 Stat. at 4727–28.

The parties agree that several portions of subsection (d)(2)(A) constitute "limitations" that take precedence over the $50 million collection mandate. For example, the $30 million annual cap on M&R payments and the statutory cap on the prices charged for water are unquestionably "limitations" on the assessment and collection of M&R payments.

All of the undisputed limitations are preceded by one of the following phrases: "Provided," "Provided further," or "And provided further." The question in this case is

whether the proportionality requirement in subsection (d), which is not preceded by similar "provided" language, is also a "limitation" that, like the undisputed limitations, takes precedence over the $50 million collection mandate.

The government contends that the proportionality requirement is not a "limitation," as that term is used in section 3407(c)(2). That interpretation, unsurprisingly, has negatively affected the plaintiffs. In recent years, the non-M&R charges that support the Restoration Fund have not made a significant contribution to the $50 million overall collection target. Consequently, the Bureau has attempted to collect the maximum allowable M&R payments to make up for the shortfall from other sources.

As noted, the overall cap on the total annual amount of M&R payments that can be collected from water and power customers is $30 million. CVPIA § 3407(d)(2)(A), 106 Stat. at 4727. Water customers' M&R payments are effectively based on their actual annual usage of water, because the amount of the payments from water customers is capped by one of the "provided" clauses in section 3407(d)(2)(A). As a result, the Bureau has not been able to collect a substantial portion of the maximum $30 million in M&R payments from water customers in recent drought years. In those years, the Bureau has required the power customers to pay the difference between water customers' low payments and the overall $30 million in M&R payments, even though that has meant charging the power customers far more than their proportional share of the M&R payments.

The trial court agreed with the government that the "proportionality" requirement of section 3407(d)(2)(A) is not a "limitation" within the meaning of section 3407(c)(2). Because the proportionality requirement is not a "limitation," the court reasoned, it does not take precedence over the $50 million annual collection goal set forth in section 3407(c)(2).

The court acknowledged that under its interpretation of the statute achieving proportionality may not be possible in some years, and that in those years the $50 million collection goal would take precedence over the proportionality requirement. Because the charges to the water customers are capped by the statute, the court's interpretation of the statute means that the power customers must make up the shortfall in reaching the $30 million annual target for water and power M&R payments, regardless of how little the water customers may have paid. As the trial court explained, in years when California has experienced severe drought, "the payment structure under the CVPIA has resulted in power customers bearing a disproportionately high assessment of payments, because the water customers' share of payments is much lower." *NCPA*, 139 Fed. Cl. at 76. The court recognized that the consequence of that interpretation of the statute "is curious in the extreme." *Id.* Nonetheless, the court concluded that the statutory language was clear and that "if the system is to be fixed, it should be addressed by Congress." *Id.*

As an alternative argument, the plaintiffs contended that the Bureau had not made sufficient efforts to collect M&R payments from other sources and thus had not satisfied its obligation to achieve proportionality in the charges between the water and power consumers "to the greatest degree practicable," even if the Bureau's interpretation of the statute was correct. The court rejected that argument and found that the Bureau's attempts to maximize the collection of M&R payments from water customers were sufficient to satisfy the proportionality requirement under the circumstances. The court therefore held that the Bureau's practices did not violate the CVPIA, and it dismissed the complaint.

On appeal, the plaintiffs challenge the trial court's construction of the statute as well as its conclusion regarding the government's liability under the allegedly erroneous interpretation.

II

Under the "$50 million approach" that governs this case, section 3407(c)(2) of the CVPIA makes the Bureau's annual $50 million collection target subject to the "limitations" in section 3407(d).  We hold that Congress's directive in section 3407(d) that M&R payments "shall, to the greatest degree practicable, be assessed in the same proportion . . . as water and power users' respective allocations for repayment of the Central Valley Project" is a "limitation." CVPIA § 3407(d), 106 Stat. at 4727–28.

The plain meaning of the term "limitations" supports the plaintiffs' argument.  A limitation is commonly understood to be a restriction.  *See, e.g.*, *Black's Law Dictionary* 926 (6th ed. 1990); *Webster's Third New International Dictionary* 1312 (1993).  Here, both parties and the Court of Federal Claims agree that the proportionality requirement is a restriction that has a limiting effect on the Secretary's freedom of action with regard to the collection of M&R payments.  Absent a clear indication that Congress intended otherwise, we must conclude that the proportionality requirement is a true "limitation" as that word is used in the statute and, as a result, that the requirement takes priority over the $50 million collection target.  *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).  None of the government's arguments persuade us that Congress intended to depart from the plain meaning of the statute's language, and we have not discovered any other reason that requires us to adopt the Bureau's statutory interpretation.

The government admits that under the "appropriations approach," the proportionality requirement is binding and takes precedence over the collection target.  Under that approach, if Congress appropriates $50 million from the Restoration Fund for the Bureau to spend on improvement activities (the maximum amount authorized by section 3407(b)), the Bureau is required to attempt to collect $50

million for the Restoration Fund through the various charges at its disposal, including M&R payments. That collection target, however, is made "subject to subsection (d)." CVPIA § 3407(c)(2), 106 Stat. at 4726. As the government acknowledges, that means that the $50 million collection target is "subject to" everything in subsection (d), including the proportionality requirement for M&R payments. Under the appropriations approach, the Bureau must therefore abide by the proportionality requirement even if that means it cannot reach the collection target of $50 million.

However, the government argues that under the "$50 million approach," the collection target, which remains at $50 million, takes precedence over the proportionality requirement for M&R payments by power customers. The government's statutory argument is based on the addition of three words to the sentence in section 3407(c)(2) that is directed to the $50 million approach. In that sentence, Congress stated that the collection target was "subject to *the limitations in* subsection (d)." CVPIA § 3407(c)(2), 106 Stat. at 4726–27 (emphasis added). The government contends that by adding the three words "the limitations in," Congress demoted the proportionality requirement to a position of secondary importance in cases governed by the $50 million approach (i.e., cases in which Congress appropriates less than $50 million from the Restoration Fund) because the proportionality requirement is not a "limitation."

The consequence of that interpretation is that, if $50 million is appropriated for the Restoration Fund in a particular year, the proportionality requirement will be in effect. However, if less than $50 million is appropriated for the Fund on an average annual basis (even one dollar less), the collection target will remain at $50 million, but the proportionality requirement will no longer take priority over that collection target.

It is difficult to imagine why Congress would have wanted the applicability of the proportionality requirement to turn on whether the amount appropriated from the Restoration Fund is exactly $50 million, rather than one dollar less. The government offers no reason that such a scheme would make sense or was contemplated by Congress. Moreover, if Congress actually intended to adopt such a dramatic distinction between appropriations of $50 million and appropriations of slightly less, it seems unlikely that it would have used such a subtle means of doing so. We are not persuaded that Congress intended such a minor difference in language to have such a substantial and seemingly perverse consequence.

As evidence that the proportionality requirement is not a "limitation" for purposes of the $50 million approach, the government notes that the other portions of subsection (d)—which both parties agree are limitations—are all preceded by one of the following phrases: "Provided," "Provided further," or "And Provided further." The government contends that if Congress had intended the proportionality requirement to be a limitation, it would have included similar prefatory language for that provision. We see no sound basis, however, to conclude that such a prefatory phrase is required in order for expressly limiting language to constitute a "limitation." Whatever the reason for the use of the two different formulations—"subject to subsection (d)" and "subject to the limitations of subsection (d)—it is difficult to imagine that Congress intended the second formulation to exclude a provision that is clearly limiting in nature.[2]

---

[2]    At oral argument, the government made clear that it does not regard the phrase "to the greatest degree practicable" as itself providing statutory authorization for the Bureau to charge power customers the difference between the amount paid by the water customers and the $30

The government also argues that the annual appropriations statutes support the Bureau's interpretation that collection of the statutory $50 million target takes priority over the proportionality requirement in subsection 3407(d). The cited language in the appropriations statutes directs the Bureau "to assess and collect the full amount of the additional mitigation and restoration payments authorized by section 3407(d)." *See*, *e.g.*, Central Valley Project Restoration Fund, Pub. L. 114-113, 129 Stat. 2404 (2015). That argument, however, depends on what payments are "authorized by section 3407(d)." And that question turns, once again, on whether section 3407(d) limits the Bureau's collection authority by ensuring that collections from water and power customers are, "to the greatest degree practicable . . . assessed in the same proportion . . . as water and power users' respective allocations for repayment of the Central Valley Project." CVPIA § 3407(d)(2)(A), 106 Stat. at 4727–28. Rather than providing an answer, the government's appropriations law argument merely presents us with the same question as before, i.e., whether the proportionality requirement is a "limitation" on the Bureau's collection authority.

Finally, the government contends that subsequent proposed but unadopted legislation supports its position. The government cites a 1995 proposal to amend the CVPIA in various ways, including placing an explicit per kilowatt-hour cap on the collection of M&R payments from power customers. That proposed legislation was not enacted. The government argues that Congress's failure to adopt a hard cap on the collection of M&R payments from power customers indicates that Congress did not mean to forbid the disparate treatment that power customers face under the CVPIA as the Bureau interprets it.

---

million annual target for collections from water and power customers, no matter how large that amount may be.

In evaluating the weight to be given to that argument, we begin with the "oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Prod. Safety Comm'n*, 447 U.S. at 117 (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)). That principle applies with even greater force where, as here, the inference as to the views of the subsequent Congress is drawn from action that the subsequent Congress did not take. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("[S]ubsequent legislative history . . . is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law."); *United States v. Wise*, 370 U.S. 405, 411 (1962) ("The interpretation placed upon an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here.").

The government points to nothing about the unenacted legislative proposal to suggest that Congress considered the proportionality requirement in section 3407(d)(2)(A) not to be a "limitation" within the meaning of section 3407(c). The government's argument that inaction by a subsequent Congress is evidence of congressional approval of the Bureau's current interpretation of the "limitations in subsection (d)" language in section 3407(c)(2) is thus unconvincing.

In sum, we conclude that the proportionality requirement of section 3407(d) of the CVPIA is a "limitation" as that word is used in section 3407(c)(2). The proportionality requirement thus takes priority over the collection target set by section 3407(c)(2). Because we agree with the appellants' interpretation of the statute, it is unnecessary for us to address the arguments made by the appellants in the alternative, that even assuming the Bureau's interpretation of the CVPIA was correct, the Bureau failed to take measures necessary to achieve the goal of proportionality

"to the greatest degree practicable."  Accordingly, we reverse the judgment of the Court of Federal Claims and remand for further proceedings consistent with this opinion.

Costs to the appellants.

**REVERSED and REMANDED**