**CORO, INC., et al., Petitioners,**
**v.**
**FEDERAL TRADE COMMISSION,**
**Respondent.**
**No. 6267.**

United States Court of Appeals
First Circuit.
Heard June 2, 1964.
Nov. 10, 1964.

**150**

Ira M. Millstein, New York City, with whom Marshall C. Berger, Irving Scher and Weil, Gotshal & Manges, New York City, were on brief, for petitioners.

Gerald Harwood, Atty., F.T.C., with whom James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

Coro, Inc., is a New York corporation with its home office in the City of New York and manufacturing plants in Canada, England and Providence, Rhode Island. It is and for years has been engaged in the business of manufacturing, selling and distributing costume jewelry and, until recently, watches.[1] Coro's stock has been listed on the American Stock Exchange since 1929. It does a nation-wide business and the hearing

examiner described it as "a large, responsible, publicly held corporation."

Most of Coro's sales have always been to department stores, variety stores and similar retail outlets. But beginning in 1955 or 1956 it began to sell a special line of jewelry and watches exclusively to so-called "catalogue houses."[2] In connection with this line of business Coro furnished printed sheets, and in some instances photographic transparencies, for binding in the catalogue houses' catalogues describing and illustrating Coro's products and giving the price at which the product could be bought from the catalogue house plus a wholly fictitious "list" or "retail" price which was arrived at in accordance with the general prevailing practice of catalogue houses by application of the so-called "three-times formula." By this formula the price at which Coro sold an item to the catalogue house was multiplied by three to arrive at a purported list or retail price for the item and that price was divided in half to arrive at the price at which the house advertised and inevitably sold the article to purchasers. Thus a purchaser looking at the catalogue would assume that he was buying from the catalogue house for one half the usual ordinary retail price charged for the item in the area, whereas in truth and in fact there was no such price or indeed any retail price for the article anywhere because it was part of a special line manufactured exclusively for and sold only by and through catalogue houses.

Coro advertised the watches it sold to catalogue houses through its wholly owned subsidiary as "guaranteed in writing for one full year," and "guaranteed imported Swiss movement" thereby representing that the watches were unconditionally guaranteed, whereas the written guarantee which went to the ultimate

1. It conducted its watch business through a wholly owned subsidiary corporation.

2. These establishments sell from catalogues to industrial, commercial and fraternal organizations for their use as gifts to customers or prizes or awards to employees or members, to small-town retailers for resale to customers, and, to a limited extent, to individual customers who purchase by mail-order or over the counter at "show-rooms," in effect retail stores, which catalogue houses operate in a few of the larger cities.

purchaser with the watch required payment of a service charge.

Apparently by 1960 Coro entertained misgivings as to the propriety of printing fictitious "list" or "retail" prices on the sheets it submitted to catalogue houses for insertion in their catalogues. It is not entirely clear whether these misgivings sprang from an investigation already started by representatives of the Federal Trade Commission or not. At any rate for the year 1960 Coro did not suggest any "list" or "retail" prices on the catalogue sheets it sent to catalogue houses but printed thereon only the cost of its items to the catalogue house. However, with these sheets Coro sent a letter to the catalogue houses which in pertinent part stated: "On the basis of past experience, we can advise you that catalogs using our insert usually take a mark up of 50% on their cost. Catalogs usually suggest a retail price of double this amount for their dealer." In December, 1960, definitely after investigation by the Federal Trade Commission had begun, Coro stopped its sales to catalogue houses altogether and in April, 1961, the Federal Trade Commission issued a complaint against Coro, Inc., and also against Gerald E. Rosenberger individually, Coro's president, largest stockholder and the chairman of its board of directors, and two of Coro's principal executive officers. The complaint alleged two substantive offenses. It charged first that by supplying catalogue houses with sheets for insertion in their catalogues showing fictitious and exaggerated retail prices for its products Coro had supplied retailers with the means for misleading their customers and the public as to the usual prevailing retail prices of its products, and second that Coro had misrepresented the guarantee covering its watches in that it represented in its catalogue insert sheets that its watches were "unconditionally guaranteed," whereas in fact the guarantee called for the payment of a service charge.

After hearings at which both sides adduced evidence, the hearing examiner found the charges against Coro sustained both as to the fictitious pricing of its products and as to misrepresentation of the guarantee on its watches, but, finding no sufficient reason for holding Rosenberger and the other corporate officers individually responsible, he dismissed the complaint as to them. Coro appealed to the Commission only the hearing examiner's finding that it had fictitiously priced its products. The Commission granted the appeal and also notified counsel that on its own motion it would review the hearing examiner's dismissal of the complaint against Rosenberger. It denied Coro's exceptions to the hearing examiner's initial decision, overruled the examiner's dismissal of the complaint against Rosenberger and issued a proposed cease and desist order against both to which both filed exceptions. The Commission disallowed their exceptions to its proposed order and entered a final order in the same terms which we shall consider hereinafter.

The petitioners do not contest the hearing examiner's findings with respect to the advertized guarantees on the watches Coro's subsidiary sold to catalogue houses. Nor do they contest the Commission's finding that Coro engaged in the unfair practice of fictitious pricing with respect to its sales of costume jewelry to catalogue houses. They summarize their contention in their brief as follows:

> "Petitioners do not contest these findings of the Commission. Coro's explanation for having engaged in these practices was and is simply that Catalog Houses had existed for years; that Coro's competitiors were selling to the Catalog Houses and using the very practices here complained of; that Coro did nothing more than its competitors and hundreds of suppliers did; and, that while this competitive situation may not excuse Coro, it should be taken into consideration in determining whether to bring the instant proceeding, whether to dismiss the complaint once the proceeding was initiated, and finally what type of order

to enter assuming one was necessary."

The petitioners contend that no order at all should have been entered against them because Coro had stopped doing business with catalogue houses before the complaint herein was filed and had no intention of resuming that line of business in the future. Their argument in support of this contention can conveniently be divided into two phases.

One phase of their argument is that the Commission "was arbitrary, unreasonable, capricious and discriminatory" in refusing to permit them to sign a stipulation to cease and desist pursuant to sub-part E of the Commission's former Rules of Practice, Procedure and Organization quoted in pertinent part in the margin.[3]

To avail themselves of the Commission's policy favoring voluntary agreements to cease and desist the petitioners did not undertake to negotiate a consent order before trial, as they were advised that they might do in the notice appended to the Commission's complaint, wherein it is stated: "If any respondent elects to negotiate a consent order, it shall be done in accordance with Section 3.25 of the Commission's rules of Practice." Instead they elected to defend the complaint and then undertook to stipulate settlement during trial. And to establish their claim of arbitrary, capricious and discriminatory action on the part of the Commission in refusing to let them do so, they filed in the course of the proceedings before the hearing examiner an application for a *subpoena duces tecum* directing the Secretary of the Commission and its project attorney in charge of the case to appear before the hearing examiner and testify, and to bring with them "all relevant documents" in the Commission's files "bearing upon or concerning the investigation conducted in this matter and the initiation of the instant complaint, and bearing upon or concerning the policies and practices of the Federal Trade Commission with respect to former Sub-Part E of the General Procedures of the Federal Trade Commission, to wit, 'Stipulation to Cease and Desist.'"

■ The petitioners' assertion of error in denying their application for *subpoena duces tecum* to explore generally into the "policies and practices" of the Commission with respect to the disposition of cases before it by stipulation rests upon the proposition that under the circumstances they had a "right" to stipulate. This is not so. The most they had was a "privilege" to do so. But the petitioners say that the Commission cannot constitutionally deprive them of the privilege arbitrarily, capriciously or discriminatorily and that the only way they can establish such unconstitutional action by the Commission is by issuing the *subpoena duces tecum* for which they asked. The long and short of the petitioners' argument is that having given up their business with catalogue houses without any intention of resuming it, they should have been allowed on the basis of prior decisions of the Commission in other cases to close this case by stipulation and hence could only have been denied the privilege of stipulation by the arbitrary, capricious etc. fiat of the Commission which could only be discovered by a general exploration of the Commission's action in other cases.

■■ The petitioners cite no authority in support of this argument and we have not found any. Nor have they pointed out any specific action by the Commission in other practically identical cases on which to base a belief that the Commission's denial of the privilege of stipulation might have been arbitrary or

---

3. "Section 1.5. *Policy*. In order to avoid the expense and time involved in formal legal proceedings, it is the policy of the Commission to afford individuals, partnerships and corporations who have engaged in unlawful acts and practices an opportunity to enter into voluntary agreements to cease and desist therefrom, when it appears to the Commission that such procedure fully safeguards the public interest. * * * The Commission reserves the right in all cases to withhold the privilege of disposition by voluntary agreement."

capricious. All they have shown is a bare suspicion which if well founded might support their assertion of error. But subpoenas are not issued on bare suspicion. They are not licenses for extended fishing expeditions in waters of unknown productivity in the vague hope of "catching the odd one." See Bowman Dairy Co. v. United States, 341 U.S. 214, 221, 71 S.Ct. 675, 95 L.Ed. 879 (1951). Moreover, there are two obvious bases for the Commission's refusal to permit stipulation. One is that the petitioners did not seek a consent order at the outset of the proceeding but attempted to stipulate disposition during trial. The other is that the petitioners ceased doing business with catalogue houses only just before the complaint was filed and after investigation by the Commission had begun. We see no error in denying the broad subpoena requested.

The other phase of the petitioners' argument rests primarily upon National Lead Co. v. F. T. C., 227 F.2d 825, 839 et seq. (C.A.7, 1955), reversed in other particulars, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), wherein the court of appeals set aside as arbitrary a cease and desist order of the Commission directed against a respondent-petitioner which had abandoned without intention of resuming the lead pigment industry wherein the illegal practices had occurred.

■ It has long been well settled that § 5 of the Federal Trade Commission Act, from its enactment in 1914, 38 Stat. 719, to its present form, 15 U.S.C. § 45, clothes the Commission with broad discretion to determine whether a cease and desist order is needed to make certain that a method of competition or a trade practice it has found unlawful will be stopped and not resumed. The Commission, however, is not empowered to issue a cease and desist order as punishment for past offenses. It has power only to put a stop to present unlawful practices and to prevent their recurrence in the future. See New Standard Pub. Co. v. F. T. C., 194 F.2d 181, 183 (C.A.4, 1952), and cases cited. On this basis the Court

of Appeals for the Seventh Circuit in the National Lead case set aside as arbitrary a cease and desist order entered against a corporation which was no longer engaged in the lead pigment industry in which the unlawful practice had occurred and had divested itself of its production properties. See also Eugene Dietzgen Co. v. F. T. C., 142 F.2d 321, 331 (C.A.7, 1944), in which the court said: "If the practice has been surely stopped and by the act of the party offending, the object of the proceedings having been attained, no order is necessary, nor should one be entered."

■ The petitioners assert that the unlawful practice found by the Commission occurred only in connection with Coro's business with catalogue houses, and they say that the practice surely stopped when Coro abandoned that line of business without any intention to resume it. It is true that the specific unlawful pricing practice occurred only in Coro's business with catalogue houses. And it is also true that it gave up that line of business a few months before the Commission filed its complaint and that its officers testified that they had no intention to resume it. But Coro gave the line of business up only after the Commission had started to investigate its practices therein and only a few months before the Commission filed its complaint, and we have only the current corporate officers' expression of intention not to resume the business. Coro has not disposed of its plant. It is still in the costume jewelry business and there is nothing to suggest that it does not intend to continue in that general industry. We think the Commission did not exceed its statutory powers in issuing a cease and desist order against Coro.

■ The serious question involved in this appeal is the scope of the order issued by the Commission against Coro, that is whether the order should be limited to apply only to sales to catalogue houses or whether the violations in that particular line of business are a sufficient peg upon which to hang an order against

fictitious pricing throughout Coro's business.

It is true that there is no showing of past violations by Coro, that the violation found was with respect to less than 1% of Coro's business, that its conduct was in accordance with the long established practice of catalogue houses and that it stopped doing business with catalogue houses before the complaint issued. But in Jacob Siegel Co. v. F. T. C., 327 U.S. 608 at pages 611, 612 and 613, 66 S.Ct. 758 at page 760, 90 L.Ed. 888 (1946), the Court noted that the Commission "has wide discretion in its choice of a remedy deemed adequate to cope" with unlawful practices within the scope of its jurisdiction and that judicial review "extends no further than to ascertain whether the Commission made an allowable judgment in its choice of the remedy," and said: "The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." The Court in F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962), applied these principles to hold that a court of appeals erred in modifying a Commission cease and desist order so as to eliminate all references to "any other seller principal" and to "any other buyer," thus limiting application of a Commission's order to future sales by the same seller to the same buyer and we think by the same token we would err should we limit the Commission's order only to Coro's sales to catalogue houses. Nor do we think the Commission's order unclear or indefinite when interpreted and applied in accordance with the criteria outlined in F. T. C. v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957).

█ We do think, however, that there is not a sufficient showing to warrant the inclusion of Rosenberger personally in the order. He was Coro's largest stockholder, its president and the chairman of its board of directors. And there is testimony, his own, that he had "overall corporate responsibility" and "responsibility for the acts and practices of the corporation" and that he made the decision to put Coro into the catalogue house business. But there is no showing that he was aware of the pricing practices of catalogue houses or that he personally knew of Coro's participation in those practices. In short, unlike Theodore R. Hodgkins in Forster Mfg. Co. v. F. T. C., 335 F.2d 47 (C.A.1, 1964), there is no showing of Rosenberger's active or even actual personal participation in the unlawful practices of the corporation under his overall management and control. In the absence of evidence of personal involvement in Coro's unlawful conduct, we think the hearing examiner was correct in finding no sufficient reason for holding Rosenberger individually responsible and in dismissing the complaint as to him individually.

Decree will be entered modifying the Commission's order by deleting reference therein to Gerald E. Rosenberger individually and enforcing the order as so modified.